**Rabbi Mendel PIASECKI, Plaintiff,**

v.

**DAUGHTERS OF JACOB NURSING HOME, INC., Defendant.**

**No. 91 Civ. 7748 (DNE).**

United States District Court,
S.D. New York.

Dec. 22, 1992.

Law Offices of Leonard N. Flamm, New York City (Leonard N. Flamm, Norman Mednick, of counsel), for plaintiff.

Weisman, Celler, Spett & Modlin, New York City (Jesse Alan Epstein, of counsel), for defendant.

## OPINION AND ORDER

EDELSTEIN, District Judge:

Rabbi Mendel Piasecki ("plaintiff") has brought this discriminatory discharge action under the Age Discrimination in Employment Act, 29 U.S.C. § 621 *et seq.*, and under Section 296 of the New York State Human Rights Law. Defendant Daughters of Jacob Nursing Home, Inc. ("defendant" or "DOJ") has moved for summary

judgment dismissing the complaint. For the reasons stated below, defendant's motion is denied.

## Background

DOJ is a private, not-for-profit nursing home for the elderly located in Bronx, New York. Plaintiff, who was born on November 23, 1912, worked as a rabbi and a mashgiach for DOJ from June 1983 until his discharge on July 12, 1991.[1] At the time of his termination, plaintiff was 79 years old and earned $28,275 annually. His replacement, Rabbi Masod B. Edery, was hired in July 1991 at the age of 27.

Plaintiff alleges that commencing in the fall of 1987 DOJ administrators began to inquire about his retirement plans. According to plaintiff, these administrators asked him repeatedly when he intended to retire, whether he intended to die on the job, and whether he wanted to live in Florida or Israel following his retirement. In addition, whenever plaintiff raised work-related issues with DOJ administrators, they allegedly responded by telling him to retire if he was displeased with conditions at DOJ. Defendant does not disavow these statements.[2]

In May 1990, the parties altered the conditions of plaintiff's employment. While this is not disputed, the meaning ascribed to the altered conditions of employment is the subject of a schism between the parties. Prior to May 1990, plaintiff worked five days a week from 7 a.m. to 12 p.m. each day. In addition, plaintiff received extra money by substituting for DOJ's regular religious director once or twice a month for an entire weekend. DOJ asserts that plaintiff properly received $150 for each weekend he worked, but improperly requested overtime pay for weekend work.

DOJ contends that to remedy this double billing, and to assure supervision past 12 p.m. until the end of lunch, it entered into an agreement with plaintiff dated May 21, 1990 (the "Agreement") that altered plaintiff's compensation and hours. Pursuant to the Agreement, Rabbi Piasecki would work Monday through Friday from 6 a.m. until 2 p.m., as well as one weekend each month for $150, without receiving overtime pay for weekend work. Mr. Malanka contends that plaintiff's reaction to the changed hours was to request not to work weekends. In response to this request, DOJ asserts that it added an amendment to the Agreement calling for its expiration upon finding plaintiff's replacement. Although plaintiff's slated hours amounted to forty hours per week, he was paid on the basis of a thirty-five hour week. The parties dispute whether the Agreement provided for a lunch hour.

Plaintiff asserts that he signed the Agreement under duress, fearing that failure to sign would result in immediate termination. Moreover, plaintiff proffers that the Agreement reflects DOJ's attempt to force his retirement. In support of his contention, he cites the lack of lunch hour, the fact that he was to work forty hours each week but was only paid for thirty-five of those hours,[3] and his inability to collect overtime. Plaintiff states that he noted the unfairness of the Agreement to Mr.

---

**1.** A mashgiach's function is to ensure that the preparation and service of food complies with Jewish dietary laws. *Affidavit of Rabbi Mendel Piasecki in Opposition to Defendant's Motion for Summary Judgment* ("Plaintiff's Affidavit") ¶ 2, at 1.

**2.** In an affidavit, Mr. John Malanka, plaintiff's supervisor, admits that he expressed concern that plaintiff not die on the job. He allegedly made such a comment, however, only after plaintiff said "you are killing me. You can't make me work these hours. I am an old man. You want me to die on the job?" *Affidavit of Mr. John Malanka in Support of Motion for Summary Judgment* ("Malanka Aff."), at 5.

**3.** Plaintiff contends that a mashgiach's job requires constant supervision and does not permit any break. *Plaintiff's Affidavit* ¶ 3, at 1. Therefore, the five hour differential between slated hours and paid hours cannot represent a lunch hour. *Id.,* ¶ 21, at 6. Defendant responds by noting that prior to the Agreement, plaintiff performed other tasks during the hours he was supposed to be supervising food preparation, such as escorting DOJ residents to and from services. According to DOJ, then, a mashgiach's job is not so all-consuming. *Defendant's Reply Memorandum of Law,* at 3–5. For an analysis of this aspect of the parties' dispute, see *infra* pp. 12–13.

Malanka, who replied "Okay, if you will be a good boy, if you will come earlier, I will let you go earlier."

In the months following the signing of the Agreement, it is undisputed that Rabbi Piasecki often left work before 2 p.m. or failed to punch out entirely. On August 1, 1990 and again on March 13, 1991, Mr. Malanka sent plaintiff a memorandum citing plaintiff's early departures and threatening plaintiff's discharge if plaintiff continued to leave work early. Rabbi Piasecki asserts that his early departures had been approved by Mr. Malanka.[4] In addition, plaintiff asserts his belief that during the seven month lag between the two memoranda, his early-arrival early-departure practice became an accepted routine.

The next point of contention between the parties centers on the hiring of Rabbi Edery. DOJ avers that in order to assure supervision through dinner, it hired Rabbi Edery in July 1991 to supervise meals from 2 p.m. to 7 p.m. Plaintiff asserts that DOJ hired Rabbi Edery on July 3, 1991, not, as DOJ contends, on July 15, 1991. According to plaintiff, a July 3, 1991 hiring implies that DOJ decided to replace plaintiff eight days before it fired him. Plaintiff also contends that DOJ does not require Rabbi Edery to punch in and out, but rather allows him to submit time sheets. Mr. Malanka, on the other hand, contends that DOJ originally hired Rabbi Edery to work only from 2 p.m. until 7 p.m., which ensured the presence of a mashgiach through dinner. After firing plaintiff, however, Rabbi Edery offered to work both the morning and afternoon shifts.

Evincing remarkable consistency, the parties also dispute the meaning attributable to the event that triggered plaintiff's discharge. On July 11, 1991, plaintiff left DOJ without punching out. Plaintiff contends that he developed a toothache that day and had to leave for the dentist imme-

diately. He adds that although he sought to inform Mr. Malanka or Mr. Preira, another DOJ administrator, of his intended departure, he was unable to locate either one. On reporting to work the following day, Mr. Malanka informed plaintiff that he was discharged.[5] Mr. Malanka contends that upon discharging plaintiff, he told him that the termination resulted from plaintiff's failure to work the required hours and from his failure to punch out the preceding day. Plaintiff posits that his July 11 departure was irrelevant to DOJ's discharge decision, and that this stated reason was therefore merely a pretext given DOJ's earlier hiring of Rabbi Edery.

## Discussion

### A. Standards for Summary Judgment

"It is well settled that a court should grant a motion for summary judgment only if the evidence, viewed in the light most favorable to the party opposing the motion, presents no genuine issue of material fact." *Cable Science Corp. v. Rochdale Village, Inc.*, 920 F.2d 147, 151 (2d Cir. 1990); *see United States v. Diebold, Inc.*, 369 U.S. 654, 655, 82 S.Ct. 993, 8 L.Ed.2d 176 (1962); *Owens v. New York City Housing Auth.*, 934 F.2d 405, 408 (2d Cir.), *cert. denied*, —— U.S. ——, 112 S.Ct. 431, 116 L.Ed.2d 451 (1991). The Supreme Court has noted that whether an issue is genuine and material for purposes of summary judgment depends on "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251–52, 106 S.Ct. 2505, 2512, 91 L.Ed.2d 202 (1986). A "court may grant summary judgment ... against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case,

---

4. Mr. Malanka has not responded to plaintiff's assertion, although he notes in his affidavit that plaintiff, in his deposition, admitted to arriving early not in response to a DOJ request, but because DOJ residents wanted early religious services. He also asserts that plaintiff had no right to set his own hours and that DOJ needed

him to supervise food preparation through lunch at 2 p.m., not for early religious services.

5. In his affidavit, Mr. Malanka asserts that on questioning plaintiff as to the time of his departure on July 11, plaintiff responded "regular time."

and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986). "One of the principal purposes of the summary judgment rule is to isolate and dispose of factually unsupported claims or defenses...." *Id.* at 323–24, 106 S.Ct. at 2553. The Supreme Court added that "[s]ummary judgment procedure is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole, which are designed 'to secure the just, speedy and inexpensive determination of every action.'" *Id.* at 327, 106 S.Ct. at 2555 (quoting Fed.R.Civ.P. 1). Conclusory allegations cannot defeat a motion for summary judgment. *See Anderson,* 477 U.S. at 256, 106 S.Ct. at 2514; *Francis v. Coughlin,* 891 F.2d 43, 47 (2d Cir.1989). "To defeat a motion for summary judgment a plaintiff must offer 'concrete evidence from which a reasonable juror could return a verdict in his favor.'" *Cinema North Corp. v. Plaza at Latham Associates,* 867 F.2d 135, 138 (2d Cir.1989) (quoting *Dister v. Continental Group, Inc.,* 859 F.2d 1108 (2d Cir.1988)); *see Grant Thornton v. Syracuse Sav. Bank,* 961 F.2d 1042, 1046 (2d Cir.1992).

### B. Analysis of Age Discrimination Claims

The Age Discrimination in Employment Act (the "ADEA"), 29 U.S.C. § 621 *et seq.,* prohibits an employer from discharging, refusing to hire, or otherwise discriminating against an employee based upon the employee's age. 29 U.S.C. § 623(a)(1). In addressing the viability of suits under the ADEA, courts employ the burden-shifting analysis associated with Title VII cases, which was developed in *McDonnell Douglas Corp v. Green,* 411 U.S. 792, 802, 93 S.Ct. 1817, 1824, 36 L.Ed.2d 668 (1973) and *Texas Department of Community Affairs v. Burdine,* 450 U.S. 248, 252–53, 101 S.Ct. 1089, 1093–94, 67 L.Ed.2d 207 (1981). *See Levin v. Analysis & Technology, Inc.,* 960 F.2d 314, 316 (2d Cir.1992); *Taggart v. Time, Inc.,* 924 F.2d 43, 46 (2d Cir.1991); *Hollander v. American Cyanamid Co.,* 895 F.2d 80, 83 (2d Cir.1990).

To withstand a motion for summary judgment under the *McDonnell/Burdine* analysis, a plaintiff must first establish a *prima facie* case of age discrimination. To this end, plaintiff must demonstrate that he or she: "'(1) was a member of a protected class; (2) was qualified for the position; (3) was discharged; and (4) the discharge occurred in circumstances giving rise to inference of discrimination.'" *Maresco v. Evans Chemetics,* 964 F.2d 106, 110 (2d Cir.1992) (quoting *Rosen v. Thornburgh,* 928 F.2d 528, 532 (2d Cir.1991)). The protected class under the ADEA consists of individuals who are at least 40 years of age. *See* 29 U.S.C. § 631(a); *Montana v. First Fed. Sav. & Loan Ass'n,* 869 F.2d 100, 103 (2d Cir.1989). The inference of discrimination may be shown through direct, statistical or circumstantial evidence. *See Taggart,* 924 F.2d at 46; *Montana,* 869 F.2d at 104.

If a plaintiff successfully establishes a *prima facie* case of discriminatory discharge, an employer has the burden to proffer a "non-discriminatory, legitimate business reason for the alleged discriminatory action." *Levin,* 960 F.2d at 317; *see McDonnell,* 411 U.S. at 802, 93 S.Ct. at 1824; *Taggart,* 924 F.2d at 46. The defendant merely has to produce admissible evidence of a legitimate reason for the discharge decision that would "allow a reasonable trier of fact to rationally conclude that the employment decision had not been motivated by discriminatory animus;" it is unnecessary for the defendant to "persuade the court that it was actually motivated by the proffered reasons." *Burdine,* 450 U.S. at 254, 257, 101 S.Ct. at 1094, 1096.

If a defendant sustains this burden, the onus shifts to plaintiff to demonstrate by a preponderance of the evidence that the defendant's articulated reason for the discharge is a mere pretext for engaging in prohibited age discrimination. *See Levin,* 960 F.2d at 317; *see also Burdine,* 450 U.S. at 253, 101 S.Ct. at 1093. Plaintiff may establish pretext "either directly by persuading the court that a discriminatory intent more likely motivated the employer, or indirectly by showing that the employ-

er's proffered explanation is unworthy of credence." *Burdine*, 450 U.S. at 256, 101 S.Ct. at 1095. The analysis for age discrimination under New York's Human Rights Law is identical to the analysis of ADEA causes of action. *See Mastrangelo v. Kidder, Peabody & Co.*, 722 F.Supp. 1126, 1132 (S.D.N.Y.1989).

### C. Application of the McDonnell/Burdine Analysis in this Case

■ Rabbi Piasecki has established a *prima facie* case of age discrimination. It is undisputed that he is within the protected class, that he is qualified for the position of mashgiach, and that DOJ discharged him. The only point of contention concerning plaintiff's *prima facie* case involves the fourth prong of the *McDonnell/Burdine* test, namely, whether plaintiff has articulated circumstances giving rise to an inference of discriminatory discharge. In attempting to meet this test, plaintiff asserts that DOJ administrators repeatedly made references to his age and indicated that he should retire. Specifically, they supposedly asked him repeatedly when he intended to retire, whether he intended to die on the job, and whether he wanted to live in Florida or Israel following his retirement. In addition, plaintiff alleges that whenever he raised work-related issues with DOJ administrators, they told him to retire if he was displeased with conditions at DOJ. This alone gives rise to an inference of discriminatory discharge. *See Camillo v. Coca–Cola Bottling Co.*, 776 F.Supp. 662 (N.D.N.Y.1991), *aff'd without op.*, 962 F.2d 2 (2d Cir.1992).

Furthermore, plaintiff was replaced by a younger man. This also suggests age discrimination. *See Taggart*, 924 F.2d at 46 (inference of discriminatory discharge where all of Time's new hirees were younger than plaintiff); *Mastrangelo*, 722 F.Supp. at 1133 (replacement by a younger

person is crucial to establishing a *prima facie* case of age discrimination); *cf. Camillo*, 776 F.Supp. at 664 (company's failure to replace plaintiff with a younger person suggested lack of discriminatory discharge). The age of plaintiff's replacement, in combination with the allegedly discriminatory statements, clearly yields an inference of age discrimination.[6] In a similar factual scenario, the Second Circuit in *Levin v. Analysis & Technology, Inc.*, 960 F.2d 314, 317 (2d Cir.1992), found an inference of discrimination where plaintiff alleged a series of specific derogatory references to age, and younger co-workers assumed plaintiff's duties. While the fact that DOJ hired plaintiff at age 70, when he was well within the protected class, suggests a non-discriminatory intent, *see, e.g., Melnyk v. Adria Lab.*, 799 F.Supp. 301, 319 (W.D.N.Y.1992) (plaintiff failed to establish *prima facie* case given that she was hired at 39, one year prior to entry into protected class), this hiring does not refute other indicia of discrimination.

■ Under the *McDonnell/Burdine* analysis, then, the burden shifts to defendant to articulate a legitimate, non-discriminatory reason for the termination decision. In this case, DOJ indicated that it fired plaintiff because he consistently left work early, which compromised his job performance. Defendant has supported its claim that plaintiff consistently left early by providing the Court with plaintiff's time records. These records show, and plaintiff does not dispute, that plaintiff did indeed leave work early on a regular basis. Given defendant's assertion that remaining at work was an essential element of plaintiff's job—which is highly plausible given the supervisory nature of the task—defendant has articulated a legitimate basis for firing plaintiff.[7]

■ Thus, the burden once again shifts to plaintiff, this time to show by a prepon-

---

6. The parties dispute whether DOJ employees made the alleged statements, and if they did make such statements, the parties disagree as to their meaning. Resolving such factual disputes, however, is beyond the permissible scope of this Court's review on a motion for summary judgment.

7. Although defendant's assertion is not free of doubt, *see infra* pp. 1142–1143, DOJ has satisfied the *McDonnell/Burdine* standard by producing admissible evidence of a legitimate reason for the discharge.

derance of the evidence that DOJ's stated reason for the termination decision is merely a pretext that allows it to practice unlawful age discrimination. To sustain this burden, plaintiff offers: (1) the unfair aspects of the Agreement, which according to plaintiff forced him to work long hours without a lunch break and thus reveals a desire to force plaintiff's resignation; (2) the circumstances surrounding Rabbi Edery's hiring, which supposedly indicate that DOJ had decided to fire plaintiff before he left early on July 11; (3) the allegedly discriminatory statements made by DOJ administrators; and (4) the statement supposedly made by Mr. Malanka that plaintiff could leave early if he came in early.

Because plaintiff's assertions raise genuine issues of material fact, summary judgment is inappropriate. Further comment is warranted, however, due to inconsistencies in both parties' arguments. Plaintiff asserts in conclusory fashion that the Agreement did not provide him with a lunch hour and yet he received compensation on the basis of a thirty-five hour week. Absent evidence to the contrary, however, the most reasonable interpretation of the Agreement is that, like many contracts, it contemplated a forty-hour week with an unpaid lunch hour. Such an interpretation is supported by the fact that prior to the Agreement, plaintiff was paid for all hours worked. Thus construed, the Agreement was not so unfair as to have forced plaintiff's resignation. Plaintiff's sole basis for an alternate contractual construction is that a mashgiach must constantly supervise food preparation, which does not allow for a lunch. Nevertheless, it is undisputed that prior to and following the signing of the Agreement, plaintiff frequently left lunch unattended. It is also worth noting that the supposed need for "constant" supervision does not suggest that DOJ attempted to foster repressive working conditions. Thus, plaintiff's construction of the Agreement is belied by circumstantial evidence and unsupported by fact or law. While it is true that all inferences must be drawn in favor of the party opposing summary judgment, even this admonition has limits. The inferences must be reasonable.

The non-movant "[i]s not entitled to the benefit of unreasonable inferences, or inferences at war with undisputed facts." *County of Suffolk v. Long Island Lighting Co.*, 907 F.2d 1295, 1318 (2d Cir.1990) (quoting *Lewis v. Nelson*, 277 F.2d 207 (8th Cir.1960)). At this stage in the proceedings, this Court is unwilling to find that no reasonable jury could credit plaintiff's interpretation. Plaintiff's interpretation, however, appears flawed.

Plaintiff next attempts to demonstrate pretext by citing the circumstances surrounding Rabbi Edery's hiring. Plaintiff's argument evinces a logical defect while defendant's rebuttal is marred by inconsistency. Plaintiff asserts that by hiring Rabbi Edery eight days before it discharged plaintiff, DOJ revealed an intent to fire plaintiff before the July 11 incident. While the need for "constant" supervision, as well as the meaning of the term "constant," is a matter of some dispute in this case, it is safe to say that a mashgiach's function involves attentiveness to food preparation. In hiring Rabbi Edery, DOJ obtained supervision of food preparation and service in the afternoon and early evening. That DOJ hired Rabbi Edery eight days before plaintiff's discharge, in order to provide supervision of food preparation during the hours plaintiff had no intention of working, hardly suggests some insidious intent on the part of DOJ. On the other hand, defendant's allegation that it hired Rabbi Edery only for the hours that plaintiff chose not to work is hardly unassailable. In deposing plaintiff, DOJ's counsel focused on plaintiff's inability to work a fourteen-hour day. If DOJ is to be believed, however, Rabbi Edery was hired not to work a fourteen-hour day, but only five hours in the afternoon. Counsel's questions reveal that DOJ may indeed have hired Rabbi Edery with the intent that he work a full day, which means that they intended to fire plaintiff at this time. Of course, this does not negate plaintiff's early departures; it only casts doubt on DOJ's assertion that plaintiff's July 11 absence led in part to his discharge.

Finally, in order to demonstrate pretext, plaintiff notes the alleged statements of DOJ supervisors concerning his retirement, and Mr. Malanka's statement that he could leave early if he came in early. It is well settled that to show pretext, plaintiff has to prove only that age was a motivating or determinative factor in the decision to terminate an employee; plaintiff is not required to show that age was the sole factor that led to a plaintiff's termination. *Levin,* 960 F.2d at 317. Moreover, the Second Circuit has noted that the *McDonnell/Burdine* analysis is not inflexible, rigid or mechanized; instead, the " 'central question is whether [the] plaintiff has presented sufficient evidence to permit a reasonable fact-finder to conclude that age was a determinative factor in the employer's decision.' " *Montana,* 869 F.2d at 104 (quoting *Hagelthorn v. Kennecott Corp.,* 710 F.2d 76, 81 (2d Cir.1983)). The Second Circuit also has indicated that summary judgment is generally inappropriate where questions of intent will ultimately be determinative. *See Maresco v. Evans Chemetics,* 964 F.2d 106, 113 (2d Cir.1992); *Rottersman v. CBS, Inc.,* 726 F.Supp. 484, 491 (S.D.N.Y.1989); *Littman v. Firestone Tire & Rubber Co.,* 709 F.Supp. 461, 465 (S.D.N.Y.1989).

Even if plaintiff's prior arguments in support of pretext are unreasonable, these statements alone raise a genuine issue of material fact and render summary judgment unsuitable at this time. Indeed, the alleged statements were directed at plaintiff and unambiguous. This is significantly different from situations where courts have found that plaintiffs failed to rebut a proffered reason for the discharge by resorting to isolated or ambiguous statements. Moreover, DOJ's continued toleration of plaintiff's early departures may indeed indicate that it accepted such practices. *See, e.g., Levin,* 960 F.2d at 317 (plaintiff's poor attitude had been accepted by superiors, and thus, giving this as stated reason for discharge was suspect); *Melnyk,* 799 F.Supp. at 319 (one statement, not directed at plaintiff, that company wanted young and energetic salespeople, was insufficient to demonstrate that articulated reason for discharge was pretextual);

*Camillo,* 776 F.Supp. at 665–66 (same principle).

Due to these statements and the procedural posture of the case, this Court is unable to determine whether age was a determinative factor in the discharge decision. Thus, summary judgment on the ADEA claim, and by extension on plaintiff's cause of action under New York's Human Rights Law, is inappropriate.

### Conclusion

For the reasons stated above, defendant's motion for summary judgment is DENIED. The parties are directed to file a joint pretrial order on or before January 27, 1993.

SO ORDERED.